**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JEFFREY SCOTT PARSONS,**

      **Plaintiff,**

**vs.**                                 **CIVIL ACTION NO. 3:19-CV-00439**

**ANDREW SAUL,
COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered June 7, 2019 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 15, 16)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for remand (ECF No. 15), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 16); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Jeffrey Scott Parsons, (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on May 30, 2016 when he was 49 years old, alleging disability since May 12, 2015 because of inner ear problems and arthritis.[1] (Tr. at 62, 186) His claim was initially denied on September 14, 2016 (Tr. at 83-87) and again upon reconsideration on November 10, 2016 (Tr. at 89-95). Thereafter, Claimant filed a written request for hearing on December 8, 2016. (Tr. at 98-99)

An administrative hearing was held on May 24, 2018 before the Honorable Jerry Meade, Administrative Law Judge ("ALJ"). (Tr. at 43-60) On August 15, 2018, the ALJ entered an unfavorable decision. (Tr. at 12-36) On August 20, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 260-263) The ALJ's decision became the final decision of the Commissioner on April 11, 2019 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On June 7, 2019, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings (ECF No. 15), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 16). Consequently, this matter is fully briefed and ready for resolution.

---

[1] In his Disability Report – Appeal, submitted on September 29, 2016, Claimant alleged that he experienced "[i]ncreased mood swings, anxiety, nausea, headaches, and increased body pain." (Tr. at 214) Claimant asserted that he also started to have "[i]ncreased vomiting, and dizziness" as well as "increased feet pain with numbness and tingling" in a subsequent Disability Report – Appeal submitted on December 9, 2016. (Tr. at 237)

**Claimant's Background**

Claimant was 49 years old as of the alleged onset date, a "younger person", but then changed age categories by the time of the ALJ's decision to a "person closely approaching advanced age." See 20 C.F.R. § 404.1563(c), (d). (Tr. at 29) Claimant has a high school education and received further training in welding. (Tr. at 187) For the past 15 years, Claimant worked as a millwright and casting furnace operator pouring hot metal at an aluminum plant. (Tr. at 54)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

3

The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. <u>Id</u>. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." <u>Id</u>. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

4

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to this subpart.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

5

**<u>Summary of ALJ's Decision</u>**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2021. (Tr. at 17, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of May 12, 2015. (Tr. at 18, Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the cervical spine; hearing loss and tinnitus; and vertigo. (<u>Id</u>., Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 20, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform medium work with the following limitations:

> He can never climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs. He can occasionally balance, stoop, kneel, crouch, and crawl. He can never operate a motor vehicle. He must avoid concentrated exposure to extreme cold and extreme heat. He must avoid all exposure to vibrations and hazards such as moving machinery and unprotected heights. The claimant is limited to occupations that do not require frequent verbal communication or frequent telephone communications.

(<u>Id</u>., Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing his past relevant work. (Tr. at 29, Finding No. 6) In addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience and RFC, the ALJ determined that there were other jobs that existed in significant numbers in the national economy that Claimant could perform. (<u>Id</u>., Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from

May 12, 2015 through the date of the decision. (Tr. at 30, Finding No. 11)

**<u>Claimant's Challenges to the Commissioner's Decision</u>**

In support of his appeal, Claimant asserts three main grounds of error.

First, Claimant argues that the ALJ did not adequately explain why he rejected some of the opinions provided by his treating physician, Wesley Lieving, D.O., to the extent that Claimant's vertigo rendered him disabled. (ECF No. 15 at 6-7) Second, Claimant argues that the ALJ's RFC finding is not supported by substantial evidence because it fails to address Claimant's limitations due to his vertigo despite the evidence, including treating source opinion evidence, supporting same. (<u>Id</u>. at 7-8) Third, Claimant contends that pursuant to Social Security Ruling ("SSR") 00-4p, the ALJ was required to resolve any apparent inconsistencies between the vocational expert's testimony and the Dictionary of Occupational Title ("DOT"); because the vocational expert did not specify any DOT numbers, the ALJ had no way of knowing there was a conflict, and because the ALJ did not fulfill this obligation, his step five finding is not supported by substantial evidence. (<u>Id</u>. at 9-10)

Claimant requests this Court to remand for correction of these errors. (<u>Id</u>. at 10)

In response, the Commissioner asserts that the ALJ properly evaluated Dr. Lieving's opinions and explained the weight he gave for them; additionally, the Commissioner points out that neither the Regulations nor the jurisprudence within this District require an adjudicator to discuss all evidence of record or every treatment note. (ECF No. 16 at 10-11) The ALJ appropriately gave less weight to Dr. Lieving's opinions that not only concerned issues reserved to the Commissioner, but to the extent that they conflicted with the objective evidence as well as Dr. Lieving's own treatment notes. (<u>Id</u>. at 11-12)

7

In assessing Claimant's RFC, the ALJ explicitly noted the medical evidence of record that supported his determinations, which included the normal diagnostic imagining findings, and Claimant's own admissions that his symptoms related to vertigo was improved with medication and physical therapy, as well as Claimant's other activities on his farm that did not appear to be significantly affected by his complaints of dizziness and vertigo. (Id. at 13-14) The State agency medical consultants' opinions also provided support for the ALJ's RFC assessment. (Id. at 14-15) Further, the Commissioner argues that the ALJ considered Dr. Lieving's opinions that were the functional equivalent of his treatment notes concerning Claimant's limitations from vertigo and has not shown how the ALJ's failure to specifically address these treatment notes was erroneous. (Id. at 15-16) The RFC assessment with respect to Claimant's vertigo is supported by substantial evidence. (Id. at 16)

Finally, the Commissioner contends that courts within this Circuit, including this District, have rejected the notion that the absence of DOT codes during a vocational expert's testimony requires remand. (Id. at 16, 17-18) The vocational expert below testified there were no conflicts between his opinions and the DOT and the ALJ reasonably relied upon the vocational expert's testimony in compliance with SSR 00-4p. (Id. at 18-19)

In sum, the Commissioner asks this Court to affirm. (Id. at 20)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Primary Care Physician Treatment Records:

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The record shows Claimant has a history of disequilibrium since childhood. (Tr. at 273)

Claimant had unremarkable examinations with his primary care provider, Wesley Lieving, D.O., in 2015. For instance, in May, he saw Dr. Lieving for complaints of dizziness (Tr. at 331). On examination, there were no gait, sensation, strength, or coordination deficits noted (Tr. at 334, 335). Vestibular (balance) training was recommended (Id.).

Claimant returned to Dr. Lieving in August (Tr. at 264). On examination, he exhibited ataxia with lateralization to the right, but otherwise had an unremarkable examination (Tr. at 266). Dr. Lieving noted that an MRI of Claimant's brain was normal (Tr. at 264). Occupational therapy was recommended (Tr. at 267).

Claimant completed physical therapy by October and his vertigo was "improving" (Tr. at 342). At the rest of his appointments in 2015, physical examinations were entirely normal (Tr. at 269-271, 344, 345, 349, 350, 355-356). Dr. Lieving also noted that an MRI of Claimant's brain was normal (Tr. at 353).

In January 2016, Claimant reported he felt "ok" as long as he did not "move his head to the left too much" (Tr. at 358). A physical examination at this time was normal (Tr. at 360, 361). Claimant continued to follow-up with Dr. Lieving throughout 2016. Despite his complaints of vertigo, Claimant's examinations were routinely unremarkable (Tr. at 365, 366, 371, 376, 381, 386, 391, 525, 531). Dr. Lieving noted that Claimant's diagnostic testing including an EMG of his legs and laboratory tests were all normal (Tr. at 528).

In 2017 and 2018, Claimant had generally normal examinations (Tr. at 536-537, 546-547, 553, 577).

Physical Therapy Records for Vertigo:

Claimant went to Pleasant Valley Hospital Rehabilitation Services for balance and vestibular exercises in 2015 and toward the end of 2016 (Tr. at 273-274, 277, 427-510). In June 2015, he reported he could control his vertigo by "stabilizing his gaze on an object or avoiding turning his neck too quickly" (Tr. at 429). He was able to work in his garden and perform activities of daily living (Id.). By the end of the month, he demonstrated "improvement with duration and intensity of exercise" with "reduced duration of symptoms" (Tr. at 440). In August, he was "much better overall" (Tr. at 463). At his next sessions, he stated he continued "to do well" and was "pretty much back to his baseline" (Tr. at 277, 278). His balance was "much improved" and he was "doing anything that he want[ed] to do" as long as he "watche[d]" how he did it, including climbing a ladder and trimming tree limbs (Tr. at 277, 278, 472, 473). In December 2016, he reported walking up to two miles daily, setting traps on his farm, and staying active (Tr. at 477, 481, 485).

Specialist Treatment Records:

Claimant saw Dr. Alvaro Gutierrez, M.D., a neurophysiologist, in September 2015, October 2015, and January 2016 (Tr. at 411-422). Claimant reported that his dizziness occurred after "sudden standing or stretching," and stated that he had been better since taking Midodrine (Tr. at 411, 416). His physical examinations were generally normal including normal motor strength, normal senses, a normal gait, and intact coordination (Tr. at 412, 413, 418, 421). Dr. Gutierrez noted that an MRI of Claimant's brain was normal, as was a nerve conduction study (Tr. at 411, 424). In terms of treatment, Dr. Gutierrez recommended an "immediate squat" for acute symptoms, slow position changes, increased water intake, avoidance of caffeine, and small meals (Tr. at 418, 422).

In February 2016, Claimant drove to Ohio for an evaluation with Judith White, M.D., Ph.D., Medical Director at the Dizziness, Balance, and Falls Center (Tr. at 295-299). He reported that his vertigo symptoms "wax[ed] and wan[ed]" when he moved his head to the left side (Tr. at 296). Upon examination, there were no gait, sensation, strength, or coordination deficits noted (Tr. at 297). The next month, Claimant saw Aaron Moberly, M.D., for dizziness (Tr. at 312). He reported that his vertigo occurred when he rolled over in bed (Id.). Claimant had an entirely normal neurological examination including an intact gait with no imbalance (Id.). Dr. Moberly noted an MRI of Claimant's brain was unremarkable (Tr. at 315).

In October 2016, Claimant saw Thomas Jung, M.D., an ENT specialist (Tr. at 401). On examination, coordination abnormalities were noted (Tr. at 403). Claimant did not return to see Dr. Jung again until August 2017 at which time Claimant reported he had not had any "severe bouts [of disequilibrium and gait unsteadiness] since [the] last exam" (Tr. at 696). An examination was normal (Tr. at 697-698). Dr. Jung encouraged him to reduce his caffeine intake and drink more water (Id.).

Opinion Evidence:

In September 2016, State agency physician Pedro F. Lo, M.D., reviewed Claimant's records and opined that he had no exertional limitations (Tr. at 61-70). Dr. Lo further opined that Claimant could occasionally climb ladders and stairs, stoop, kneel, crouch, and crawl; never balance, climb ladders, ropes, or scaffolds; and must avoid exposure to extreme temperatures, vibration, and hazards due to his vertigo (Tr. at 68).

In November 2016, Palle Reddy, M.D. reviewed Claimant's medical records at the reconsideration level and affirmed Dr. Lo's assessment of Claimant's residual functional capacity,

except he opined that Claimant could occasionally balance (Tr. at 71-80).

In April 2017, Dr. Lieving opined that Claimant was "permanently disabled" (Tr. at 539). He opined that Claimant "cannot work around moving objects, operate heavy machinery (forklifts), climb, or be near dangerous situations (furnaces)" (Id.).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he stopped working due to dizziness and loss of balance which caused him to vomit. (Tr. at 47-48) He had become a liability at the plant where he worked. (Tr. at 47) He said that also in 2015, he experienced dizziness while changing oil in his vehicle, where it appeared that his car was spinning and that some nights when he would lie down, it felt like the whole room was spinning. (Tr. at 49) He also noticed the same sensation when he climbed a ladder to fix a roof leak in 2015. (Id.) Because of this, his doctor told him no driving, no operating equipment and no climbing ladders. (Tr. at 50)

Claimant stated that he has these dizzy spells usually once a day, sometimes twice. (Id.) He also falls from time to time; he has these spells with balance issues especially while walking or moving around. (Id.) He uses the walls at home to help stabilize himself and when out in his fields, he uses a stick for balance. (Tr. at 50-51)

Claimant testified that he usually tries to lay down or sit to alleviate his symptoms, and try to stare off into space or to focus on something. (Tr. at 51) He estimated that it takes about two hours and sometimes days to get over his symptoms. (Id.) He testified that rain and barometric pressure affects his inner ear which can cause the symptoms to last longer. (Tr. at 51-52)

Although he does household chores such as laundry, cleaning, and doing dishes, he cannot finish until his dizzy spell passes or his wife will finish them. (Tr. at 53)

Vocational Expert ("VE") Testimony:

The ALJ asked the VE to assume a hypothetical individual with Claimant's age, education and work experience who was able to perform medium work but can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch and crawl; can never operate a motor vehicle; must avoid concentrated exposure to extreme cold and extreme heat; must avoid all exposure to vibrations and hazards such as moving machinery and unprotected heights; limited to occupations that do not require frequent verbal communication or frequent telephone communication. (Tr. at 55) When asked if there were other jobs the individual could perform, the VE responded that at the medium level, the individual could perform the work of a night cleaner and laundry worker. (Tr. at 56)

The VE further testified that if the individual missed three to four days of work each month due to vertigo, the individual could not work. (Id.) The VE also stated that if the individual had to stop working from one to three or more hours per day due to vertigo symptoms, then the individual could not maintain employment. (Tr. at 57) With regard to a limitation where an individual is to never balance, the VE opined that pursuant to the DOT, such a limitation would not present a big factor for the jobs identified because balancing was not present for the physical requirements of the jobs. (Tr. at 58) However, if the individual needed to sit down at will, the VE opined that it would eliminate the light and medium jobs; also, if the individual needed a cane to balance, this would eliminate the medium and light jobs. (Tr. at 58-59) This limitation would limit the individual to sedentary work. (Tr. at 59)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Evaluation of Opinion Evidence:

The Regulations provide the definition for "medical opinions":

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(1). The Regulations further provide that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."

14

Id. § 404.1527(b). "Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion." Id. § 404.1527(c). The Regulations govern how an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. Id. § 404.1527(d)(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. § 404.1527(d)(3).

With respect to the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2).[3] Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. Id. § 404.1527(c)(2). Additionally, the Regulations state that the Commissioner "will always give good

---

[3] The treating source rule has since been eliminated, effective March 27, 2017, however, because this claim predated this rule change, the pertinent Regulations in effect at the time apply. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5853 (Jan. 18, 2017).

reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id.

Prior to his evaluation of Dr. Lieving's opinions concerning Claimant's vertigo, the ALJ considered Claimant's own statements that he had problems with vertigo off and on over the years, that it worsened significantly in May 2015, and he now has vertigo several times a day. (Tr. at 21) It was further noted that Claimant's symptoms were exacerbated by looking to the left or changing positions suddenly and that loud noises, heat, rainy weather, looking up and jerking quickly cause him to feel dizzy. (Id.) Further, the ALJ acknowledged that Claimant endorsed having fallen down several times because vertigo causes him to lose his balance and that he uses a cane or stick to help with balance at times. (Id.) The ALJ noted that Claimant stated that he must lie down or sit reclined until his symptoms pass. (Id.) The ALJ also noted that Claimant said his episodes of vertigo usually last a few minutes and improve with sitting or lying down. (Id.)

In addition to Claimant's statements, the ALJ reviewed the medical record concerning vertigo. (Tr. at 21-26) Due to allegations of persistent syncope, Claimant underwent an MRI of his brain in March 2013, the results were normal. (Tr. at 21, 647) After presenting to the hospital in May 2015 for sudden onset of severe vertigo with nausea and vomiting, Claimant was hospitalized for several days where he received IV fluids due to hydration. (Tr. at 21-22, 427, 666) The ALJ also reviewed Dr. Lieving's treatment records, the physical therapy records, as well the reports from consultative specialists concerning Claimant's vertigo, detailed *supra*. Significantly, the ALJ noted that Claimant's complaints of dizziness and vertigo persisted, especially with positional changes and rainy/hot weather, despite the absence of objective findings in imaging tests. (Tr. at 22, 23, 24, 25) The ALJ acknowledged that Claimant's issues with vertigo increased when working

in the heat, not keeping hydrated, and turning his head too quickly and that medication relieved his symptoms, which was corroborated by the medical record. (Tr. at 25)

In his comparison of the medical evidence with Claimant's statements about his vertigo symptoms, the ALJ noted that at one point Claimant stopped taking his medication because he did not want to "mask" his symptoms in order to find out the cause of his condition. (Tr. at 25, 451)[4] The ALJ further noted that during an exam in July 2015, Claimant reported to his provider that he was working under his house to repair a water line and that "he was mowing grass with a riding mower"[5] (Tr. at 25, 432), but "[a] few days later he reported he had been working on his lawnmower and was doing better." (Tr. at 25, 438) It was also noted that Claimant reported a few days later that he was "feeling nauseous and vomiting with the high humidity and picking vegetables out of his garden, but he felt better after the rain started."[6] (Tr. at 25,  452) The ALJ noted that Claimant continued to report nausea and vomiting due to high humidity and picking vegetables and admitted to his provider that he may be doing too much around the farm. (Tr. at 25, 456) Additional treatment notes document Claimant's continued complaints of feeling nauseous after being active outside (Tr. at 25, 461), feeling dizzy after bending over for some time to pull weeds (Tr. at 25, 444), and feeling dizzy coming down a ladder after he climbed onto his roof to check a leak (Tr. at 25, 447).

---

[4] It is noted that this is from a treatment record dated July 14, 2015 from Pleasant Valley Hospital Rehabilitation Services.

[5] The entirety of the comment from the treatment note, dated June 15, 2015 actually reads as follows: "Patient reports that he saw Dr. Wade and he said that the MRI looked good. He reports that he put off work until July 30th. He reports that he had a pretty good weekend considering he worked under the porch on a water line. Reports that he discovered he can't use a riding mower."

[6] The complete comment in this particular treatment note states: "Patient c/o being very 'off balance' today and staggering around. No c/o dizziness or increased L ear pressure. His ear started to feel better Wednesday once the rain started. He states that Tuesday's treatment made him feel better but he still was not 100% back to normal. He reports falling Wednesday d/t losing his balance while picking cucumbers in his garden."

The ALJ then reviewed Claimant's activities that were documented in numerous treatment records throughout the relevant period: in July 2015, despite his doctor's advice to avoid caffeine and stay hydrated to manage his condition, Claimant admitted to drinking 12 cups of coffee a day (Tr. at 25, 444); in August 2015, Claimant reported "he was now 60 percent better and that he was able to walk and look at his cell phone at the same time without feeling dizzy" (Tr. at 25, 463) and that a short time later, he went to the County Fair and had minimal dizziness there, though his neck was sore from driving (Tr. at 25, 465); later that month, Claimant reported he became dizzy when he turned too quickly while digging and weed eating (Tr. at 25, 467); in September 2015, Claimant reported that he worked on his wife's car in the heat and felt dizzy for about five minutes, but later in the day he worked on his truck and "felt okay" (Tr. at 25-26, 470); a few days later, Claimant told his provider that that "he was 90 percent better and 'doing anything that he wants' if he watched how he did it" (Tr. at 26, 472); a few days afterwards, Claimant reported to his provider that he climbed a ladder to trim tree limbs without any problems (Tr. at 26, 473); by December 2015, Claimant reported that he had been walking about two miles a day on his farm to set traps (Tr. at 26, 477); in June 2016, Claimant reported being able to work in his garden, do activities around the house, and had no vomiting episodes for six months (Tr. at 26, 429); in September 2016, he reported to Dr. Lieving that he had been working on his truck but needing help to get up from the ground (Tr. at 26, 521); in October 2016, he reported to Dr. Jung that he had not had an episode of spinning for two months (Tr. at 26, 401); in December 2016, Claimant reported neck pain after driving to Dayton to visit his son, although he also reported being busy "all day" (Tr. at 26, 479) and that "he had increased symptoms when he engaged in activities with extreme focus (looking through a riflescope)" (Tr. at 26, 528); and finally in June 2017, Claimant complained to

Dr. Lieving of "some foot irritation and he revealed that he would 'frequently' get[] debris in his boots from the farm work" (Tr. at 26, 550).

> From this evidence, the ALJ then considered Dr. Lieving's opinions as follows:
>
> In January 2016, Dr. Lieving opined that the claimant "cannot operate machinery (fork lift, cranes, etc.)" (Exhibit 5F page 36). In April 2016, Dr. Lieving noted that the claimant "cannot operate heavy equipement [sic], fork trucks, or any overhead cranes" (Id. at page 46). In April 2017, Dr. Lieving indicated that the claimant "cannot work around moving objects, operate heavy machinery (forklifts), climb, or be near dangerous situations (furnaces)" (Exhibit 13F page 1). These opinions are given great weight because they are consistent with the objective evidence of record regarding the claimant's vertigo.

(Tr. at 26-27, 361, 371, 539) Additionally, the ALJ noted that Dr. Lieving indicated that Claimant was permanently disabled. (Tr. at 28, 537, 539, 578) Accordingly, the ALJ cited the Regulations that explicitly state that such statements do not constitute "medical opinions" but are instead opinions on issues reserved to the Commissioner, and therefore declined to analyze such opinions pursuant to Section 404.1527(c). (Tr. at 28-29) The ALJ then stated that although these statements were considered, he afforded them little weight because they "fail to express the claimant's functioning in terms of specific limitations (e.g., how often can the claimant sit, stand, lift, carry, etc. . .)" and because they are inconsistent with the objective evidence of record. (Tr. at 29)

Claimant has argued that the ALJ's evaluation of the opinion evidence from Dr. Lieving falls short of legal requirements because the ALJ did not explain why he rejected the other limitations noted by the physician, specifically, that once Claimant develops vertigo, he must stop and that his symptoms are unpredictable in time, severity, and duration, thus rendering him disabled. (ECF No. 15 at 6-7) As noted *supra*, Section 404.1527(a)(1) defines medical opinions as including a statement as to "what you can still do despite impairment(s)" and the ALJ explicitly found, appropriately, that Dr. Lieving's opinions that Claimant is disabled do not include his

assessment as to what Claimant can still do despite his vertigo. As noted by the Commissioner, this Court has rejected any requirement that an ALJ is obligated to discuss every piece of evidence of record, but only to consider all of the evidence. (ECF No. 16 at 11; citing Goad v. Astrue, No. 06-00870, 2008 WL 644881, at *1 (S.D.W.Va. Mar. 7, 2008); Nisbet v. Colvin, No. 13-33047, 2015 WL 893010, at *17 (S.D.W.Va. Mar. 2, 2015); Bays v. Colvin, No. 14-1564, 2005 WL 769784, at *21 (S.D.W.Va. Feb. 23, 2015). Moreover, the ALJ reviewed all the evidence, including medical records from Dr. Lieving, which documented many activities Claimant had been capable of doing despite having vertigo. (Tr. at 25-26)

In short, the limitations noted by Dr. Lieving are not inconsistent with those accounted for in the ALJ's RFC assessment.[7] The ALJ provided an adequate explanation for the limitations related to Claimant's vertigo and fairly accommodated them in the resultant RFC. To that extent, the undersigned **FINDS** that the ALJ provided "good reasons" for not giving Dr. Lieving's collective opinions controlling weight. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983). The record of evidence on the whole does not suggest that the ALJ merely selected trivial or insignificant inconsistencies "[b]y relying on these limited observations to discredit the treating source opinions . . . while overlooking the record's broader import . . . ."[8] In addition to Dr. Lieving's own treatment notes, the ALJ considered the other medical opinions, as well as the other evidence of record, thus providing the necessary narrative in his ultimate determination that Dr.

---

[7] Claimant refers the Court to SSR 96-8p and Erickson v. Colvin, 2015 WL 3892293 (N.D.W.Va. Jun. 24, 2015) which concern an ALJ's failure to address inconsistencies in a medical source's opinion and the resulting RFC. (ECF No. 15 at 7) However, in the case *sub judice*, the ALJ rendered an RFC that was consistent with the limitations noted by Dr. Lieving; therefore, because the evidence and resultant RFC were not "materially" inconsistent or ambiguous to trigger the application of SSR 96-8p, the ALJ did not have to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.")

[8] Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018); Testamark v. Berryhill, 736 F. App'x 395, 398-399 (4th Cir. 2018).

20

Lieving's opinions concerning Claimant's limitations with respect to operating heavy equipment and to avoid dangerous environments were entitled to great weight, but not controlling weight.

Accordingly, the undersigned **FINDS** the ALJ's evaluation of Dr. Living's opinions is supported by substantial evidence.

Claimant's RFC Assessment:

A claimant's RFC represents the *most* that the individual can do despite his limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. Id. § 404.1527(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

As stated above, the ALJ assessed Claimant's RFC with limitations that were consistent with Dr. Lieving's opinions to the extent that the medical and other evidence of record supported such limitations. Regarding Claimant's argument that the ALJ did not consider evidence concerning the limiting effects from his vertigo, including the symptoms being unpredictable as to when they occur, the duration and severity (ECF No. 15 at 8), this argument lacks merit. For starters, the ALJ explicitly discussed Claimant's statements that he had vertigo several times a day,

and that it was exacerbated by changing positions suddenly, looking to the left or up, or from jerking, and further exacerbated by loud noises, heat, and rainy weather, and that these episodes usually last a few minutes but symptoms improve with medication, lying down or sitting in a reclined position. (Tr. at 21, 25) The ALJ also discussed Claimant's medical records, which showed that he complained of persistent dizziness, as well as balancing problems that caused him to fall. (Tr. at 22, 23, 24, 25)

Significantly, the ALJ discussed Dr. Lieving's treatment notes which documented Claimant's complaints of dizziness as a result of positional changes and head movements, and from getting too hot and due to rainy weather. (Tr. at 22, 332, 337; Tr. at 23, 358) The ALJ also acknowledged that Dr. Lieving noted that Claimant reported having dizziness every two days, twice a day, when doing yard or farm work (Tr. at 24, 373), but that he was able to drive short distances where he could pull over if vertigo would hit (Tr. at 24, 376).[9] The ALJ also acknowledged Dr. Lieving's assessment in September 2016 which included chronic vertigo, tinnitus, and hearing loss. (Tr. at 24, 392)[10] The ALJ also noted that in March 2017, Claimant reported to Dr. Lieving that he had dizziness every day and that medication provided little relief and that Dr. Lieving opined that Claimant was at maximum medical improvement at that time. (Tr. at 24, 533-538) The ALJ also noted that in June 2017, Claimant told Dr. Lieving that his symptoms were worse with weather and heat (Tr. at 24, 550) and that several months later, Claimant advised

---

[9] The ALJ cited a treatment record dated June 1, 2016 wherein Dr. Lieving noted Claimant's employer did not permit him to return to work with restrictions, and that he was doing home exercises, although Antivert was not much help and that he was able to do home chores "b/c when dizziness hits him, he can stop. Episodes range from every 2 days to 2 times a day--worse with yard/farm work." (Tr. at 373) Dr. Lieving had further reported that Claimant's vertigo was "not improving" and that he was "able to do short distance driving and work if he can stop once vertigo hits him--this is unfortunately unpredictable in time, severity, and duration. proceed with disability." (Tr. at 376) Dr. Lieving also referred Claimant back to physical therapy for vestibular training and further noted that "this will only help, not correct." (Id.)

[10] Dr. Lieving also noted that Claimant's impairment(s) "limits activity severely." (Tr. at 392)

Dr. Lieving that "he could only work around the house 15-30 minutes before he had to sit down due to dizziness." (Tr. at 24, 544) Finally, the ALJ noted that during an office visit in April 2018, Claimant told Dr. Lieving that he had vertigo several times a day and that he had to sit down until those episodes passed and that he was no longer driving because of vertigo. (Tr. at 25, 573-578)[11]

Though the RFC assessment is strictly a determination reserved for the ALJ, *supra*, it is important to note that in addition to the limitations determined by Dr. Lieving resulting from Claimant's vertigo, the ALJ's RFC clearly accommodated the restrictions supported by other medical source evidence: in October 2015, Dr. Alvaro Gutierrez advised Claimant "to stay out of tree stands to avoid fall risks" (Tr. at 23, 418); in June 2015, Dr. Thomas Jung advised Claimant to avoid driving when dizzy and avoid working in hazardous or high places (Tr. at 23, 269); and in December 2015, Dr. Stephen Wetmore at WVU Medicine advised Claimant to wear hearing protection at home and work when around loud noises (Tr. at 23, 291).

The other medical opinion evidence of record further supports the ALJ's RFC restrictions with respect to Claimant's vertigo. For instance, Dr. Lo opined Claimant could never balance or climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, crawl, and climb ramps/stairs; could never drive; must avoid all exposure to vibrations and hazards such as moving machinery and unprotected heights; and must avoid concentrated exposure to extreme cold and extreme heat. (Tr. at 26, 62-70) Notably, the ALJ gave this opinion little weight because the evidence indicated Claimant did not have a complete inability to balance at all times. Dr. Reddy

---

[11] In this treatment record, Dr. Lieving noted that Claimant had "frequent spells couple times a day, unprovoked. must set down and let sx's pass. undetermined duration of spells. does not drive." (Tr. at 574) Dr. Lieving further opined: "It is my opinion he is permanently, totally disabled from his vertigo. It will not improve. Is able to do safe things (no driving, climbing) until his sx's start then he must be able to lay down until sx's pass. no meds will help. nothing helps but rest." (Tr. at 578)

opined similarly, only he found Claimant's impairments limited him to being able to occasionally balance, thus, the ALJ gave Dr. Reddy's opinion "considerable weight" finding it was generally consistent with the objective evidence of record. (Id.)

It is known that in addition to his burden of showing he has a medically determinable impairment, Claimant must demonstrate "a showing of related functional loss." See, Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (internal citation omitted). Despite Claimant's contention that his unpredictability of symptoms as documented in the medical record preclude him from all work, as discussed *supra*, the evidence of Claimant's activities did not corroborate such preclusive limitations. Again, though "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)), it is necessary that an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ's failure to specifically mention Dr. Lieving's statements and notes concerning the severity and unpredictability of Claimant's vertigo symptoms is not erroneous, and it is clear that the ALJ's citations to these particular medical records that the ALJ did "consider" this evidence in accordance with Section 404.1545(a). Nevertheless, the ALJ found that the other evidence of record, including the medical evidence, simply did not indicate that Claimant was as limited as he alleged.

In short, the ALJ's finding that Claimant's alleged symptomatology was not supported by the objective evidence was sufficient explanation for the that allows for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about

how the ALJ arrived at his conclusions" therefore remand is not necessary. <u>Mascio</u>, 780 F.3d at 637.

In sum, the undersigned **FINDS** the RFC assessment with respect to Claimant's vertigo-related limitations is supported by substantial evidence.

<u>DOT Consistency at the Fifth Step of Sequential Evaluation Process:</u>

At the final step in the sequential evaluation process, the ALJ determined that Claimant could perform medium work with additional limitations. (Tr. at 30) The ALJ noted the vocational expert testified that there were several jobs which Claimant could still perform; the ALJ then determined that the vocational expert's testimony was consistent with the DOT. (<u>Id</u>.) However, Claimant argues that the ALJ did not follow the dictates of SSR 00-4p because the vocational expert only gave testimony regarding general DOT titles without specifying the DOT number, therefore, there is no way the ALJ could determine if a conflict existed between the vocation expert's testimony and the DOT. (ECF No. 15 at 9)

As pointed out by the Commissioner, Claimant's argument lacks merit because the mere absence of DOT codes does not prevent an ALJ from fulfilling his fifth step duty to ensure a vocational expert's testimony does not conflict with the DOT. (ECF No. 16 at 16; citing <u>Hedrick v. Colvin</u>, No. 3:14-23775, 2015 WL 5003658, at *10 (S.D.W.Va. Aug. 21, 2015)) In this case, the ALJ specifically asked the vocational expert if his testimony was consistent with the DOT, and the vocational expert confirmed that it was; the vocational expert further testified that with the exception of the limitations based on absenteeism and balancing, he based his opinion on his education, work experience, and resources from the Department of Labor and Skil-TRANE Corporation. (Tr. at 59) In short, the ALJ complied with his fifth step obligations. Moreover, with

respect to the jobs identified by the vocational expert, as mandated by Section 404.1566(b), at least *one* job must be identified for an adjudicator to comply with the fifth step burden of proof, and Section 404.1566(e) provides that an adjudicator may rely upon the testimony of a vocational expert to fulfil that burden.

While the Commissioner asserts that Claimant's representative did not ask the vocational expert any follow-up questions regarding DOT codes, ostensibly to his peril, the Fourth Circuit has held "[a]lthough we could guess what these occupations require in reality, it is the purview of the ALJ to elicit an explanation from the expert ..." Pearson v. Colvin, 810 F.3d 204, 211 (4th Cir. 2015). The duty rests with the ALJ, not a reviewing court, to find facts and resolve conflicts. Radford, 734 F.3d at 296; see also Brown v. Colvin, 639 Fed. App'x. 921, 923, 2016 WL 50298, at *2 (4th Cir. Feb. 9, 2016) ("We remand to avoid engaging in fact-finding 'in the first instance' and to allow the ALJ to further develop the record so that we can conduct a meaningful judicial review"). "When a VE or VS provides evidence about the requirements of a job or occupation, *the adjudicator* has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT." See, Policy Interpretation Ruling: Titles II And XVI: Use Of Vocational Expert And Vocational Specialist Evidence, And Other Reliable Occupational Information In Disability Decisions, SSR 00-4p, 2000 WL 1898704, at *4 (emphasis added). As stated *supra*, it remains the exclusive duty of the ALJ to identify any conflicts in the evidence and to resolve them. Indeed, the burden of proof shifts to the ALJ at the fifth step of the sequential evaluation process, because "[i]n order to support a finding that you are not disabled at this fifth step . . . *we* are responsible for providing evidence that demonstrates that other work exists . . . that you can do, given your residual functional capacity and vocational factors." See 20

C.F.R. § 404.1560(c)(2) (emphasis added). Nevertheless, Claimant does not specify the potential conflict between the job titles and the vocational expert's testimony, and the ALJ specifically asked about such conflicts, therefore, the ALJ did his job.[12] Accordingly, the undersigned **FINDS** the ALJ's determination that the vocational expert's testimony was consistent with the DOT is supported by substantial evidence.

Finally, the undersigned **FINDS** that the Commissioner's final decision that Claimant was not under a disability since May 12, 2015 through the date of the ALJ's decision is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for remand (ECF No. 15), **GRANT** the Commissioner's request to affirm the decision below (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings

---

[12] The Commissioner points out that one of the jobs identified, "laundry worker", DICOT 361.684-014, 1991 WL 672983, does not present any potential or apparent conflicts as Claimant contends (ECF No. 16 at 19). Indeed, the "laundry worker" job does not appear to conflict with Claimant's RFC: "taking instructions-helping" people is "not significant"; climbing, balancing, stooping, kneeling, crouching, crawling, exposure to extreme cold, extreme heat, vibration, moving mechanical parts, and high exposed places are "not present"; and there is no requirement to operate a motor vehicle.

and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 7, 2019.

Omar J. Aboulhosn
United States Magistrate Judge